### WADDINGHAM AND OTHERS V. GAMBLE.

1. Def. in ejectment claimed title to the land in dispute as assignee of one P. to whom, def. contended, it had been confirmed by the Board of Comm'rs. but offered no evidence of the location of the land confirmed—the court did right in refusing to instruct the jury, that if they believed the confirmation to P. covered the land in question, they must find for def.
2. Nor would it prove title out of pltf. to show that the land was, subsequently to a grant to him from the King of Spain, reunited to the domain of the King by the Lieu. Gov.—The U. S who had all the title of the K. of S. having confirmed the land to the pltf.
3. The court did right in refusing to instruct the jury, that if they believed that P. had title to the land in question by possession and cultivation and subsequent confirmation &c. they must find for def. —there being no evidence to prove that the land confirmed to P. in consideration of cultivation and possession was the land in dispute, but strong proof to the contrary.
4. The judgt. of the cir. ct. in a suit for the partition of land, will not be reversed by the sup. ct. in a collateral suit—objections must come from persons interested.
5. Depositions taken at the appointed time and place, and at a reasonable time of day, are not to be excluded because the party notified to attend did not arrive until the other party had finished taking the depositions.

APPEAL from the circuit court of St Louis county.

*Spalding for appellants.*
The plaintiffs in error contend: 1st. That the deeds of the commissioners passed no title to said Gamble, because the property sold was not properly advertised—because the first deed was not a good one, and having made one and acknowledged it, the commissioners were *functi officio*, because there was no proof that the sale was made according to law, or on the day for which it was set. 2. The deposition of P. Chouteau was improperly received

(Old Rev. code, 324, sec. 2.) 3rd. As to the instructions.
—1st The first ought to have been given, for if that land
was confirmed by the board of commissioners, then the
act of 1812, did not operate on it. (See Geyer's Digest,
page 467) There was evidence that the land worked
upon and occupied by Provenchere as far back as sixty
years, including the land sued for by Gamble, was the
same land confirmed to Mullanphy, assignee of Proven-
chere. But this instruction assumes that there was no
evidence on the subject—nothing which the jury were
authorised to consider going to shew that it was the same
land. 2nd and 3rd. The 2nd and 3rd instructions re-
late to the same subject. The plaintiff, Gamble, produ-
ces a survey as his title paper, and as a part of it, the
memorandum of the granting authority that the land had
been abandoned, and had become a part of the King's
property again. It was all given in evidence without
objection on his part. The several other instructions
are referred to the court and not abandoned: but for the
want of time are not commented on in this brief, except
the two last numbered above, the 8th and 9th.

8th instruction. This instruction puts it to the court
to say that the evidence to prove certain persons heirs of
Tayon, was not sufficient for that purpose: in other
words, that there was no legal evidence of that fact.—
All the testimony was that of Leduc, who said that Chau-
vin told him they were heirs: Chauvin was not produced,
nor was he in any way accounted for.—3rd Starkie's Ev.
1100, that pedigree may be proved by traditionary dec-
larations and general reputation.—Ibid 1101 and 1102.
To warrant admission of such declarations, the party
making them must be proved to be dead at the time of
the trial, or it is not the best evidence. 9th.—This in-
struction is, that if Tayon abandoned the land, the plain-
tiff was not entitled to recover. By the Spanish law, if
a man abandoned his land, he lost his right to it. (1 Par-
tidas, 365) Provenche having afterwards possessed it,
and cultivated it, it became his under the act of 1812.

*Geyer for appellee.*

The appellee, in support of the judgment of the cir-
cuit court, contends that the deeds of commissioners; and
the depositions of Chouteau and Paul were properly re-
ceived in evidence; and that the instructions prayed for
were rightly refused. 1. The depositions were taken
within the hours mentioned in the notice; and the appel-
lee was not required by law to detain the witnesses be-

OCT. TERM
1836.

Waddingham
and others
v.
Gamble.

OCT. TERM
1836.

Waddingham
and others
v.
Gamble.

fore the officer until the last moment mentioned in the notice. 2. The proceedings in partition were in all respects regular, and the deeds executed by the commissioners according to law: the ground of objection to them was not disclosed at the trial, and cannot now be anticipated. 3. The first instruction was properly refused, because there was no evidence to justify it. The land claimed by Mullanphy, is the land conveyed to him by the deed of Provenchere, in April 1805, and the commissioners confirm that claim. The deed was not evidence, nor is there any other evidence that the land conveyed and confirmed to Mullanphy, is that claimed by the plaintiff. Besides, both parties claimed under confirmations, and the title of plaintiff is the elder. 4. The entry on the margin of the survey, is not proved to have been made by competent authority, nor is it, according to the laws then in force, sufficient to defeat a title afterwards recognised by the Government. 5. The bare possession of Provenchere, as stated in the 4th instruction, would not operate a confirmation of the land to Provenchere under the act of 1812, nor give title against a grant and confirmation to another. 6. All the parties to the proceeding in partition, are sufficiently proved to be the descendants of Joseph Tayon. Nor was it necessary for the plaintiff to prove any of them to be his heirs—that fact is prima facie established by the proceedings. If there were too many parties, that cannot defeat the right of plaintiff under those who were rightfully parties: if there were any entitled who did not join, the burthen of the proof rested on the defendants. 7.— Whether there was a reunion to the domain, or on abandonment, under the Spanish Government, or not, will not avail the defendants—they not having shewn any grant or recognition of their claim by that Government, and the land has been confirmed to plaintiff under the American Government.

Opinion of the court delivered by Tompkins J.

Statement of the case.

Gamble brought his action of ejectment in the circuit court of St. Louis county, against Waddingham, and the other defendants were on application, admitted as co-defendants. Judgment being given against them in that court, they appeal to this.—The defendant in error, on the trial of the cause in the circuit court, gave in evidence an extract from the books of the Recorder of Land Titles for the territory of Missouri: by which it appears, that an out lot of the town of St. Louis, of forty arpens, was

confirmed to Joseph Tayon, in the year 1815.   He also
gave in evidence the following extract from Livre Ter-
rien, No. 2. (a provincial land book, under the Gvernment
of Spain.)   "I the undersigned, Martin Duralde, in virtue
of the power with which Don Pedro Piernas, Captain of
infantry, and Lieutenant Governor of the Establishments
and other dependant posts of the Spanish Government of
Illinois, has invested me, at the request of the inhabitants
of this post of St. Louis, desiring that the dimensions,
courses and boundaries, of the lands which they possess'
in its vicinity, may be determined by a person competent
and authorised for that purpose, declare to all those whom
it concerns, that on the requisition of each one of said
inhabitants, during the autumn of the year 1770, and of
the spring of the years 1771 and 1772, (the days and
months whereof I do not mention, the operations having
been made by turns, and not consecutively, as to those
who have possessions distinct from each other, and situate
in different places,) and particularly on the request of Mr.
Joseph Tayon, I went from my dwelling, situate in the
said post of St. Louis, to a tract of land of one arpent
wide, by forty long, belonging to him, partly cultivated,
and partly fallow, situate in the prairie that touches this
village, and immediately on one side, upon the 'domains
of the King, of one arpent in width, and grazing by its
extremity the foot of the mound, and bounded on the
other side by Paul Kiercereau, and on the two others by
the domain of the King, to survey it."   It further appears
from the extract, that Duralde finished the survey, giving
the courses of the lines, and setting stones in the ground
at each corner.   In the margin of the book in which M.
Duralde made this entry, and oposite to that entry, was
the following memorandum in French, viz:   "Reunited
to the Royal domain from their having been abandoned
for a long time, St. Louis, 4th June 1793, Trudeau."   It
appeared in evidence that this memorandum was in the
hand-writing of Jaques Clamorgan, and that the signa-
ture was that of Zenon Trudeau, then Lieutenant Gov-
ernor of the province; but that Clamorgan held no office;
and it did not appear that Tayon had any notice of the
said entry.   The plaintiff then gave evidence of a sale
of said land among the heirs of Tayon, made by order of
the circuit court of St. Louis county, on a petition for a
partition of said land, and a deed made to him as pur-
chaser at such sale, was given in evidence.

The plaintiff offered in evidence the testimony of sev-
eral witnesses taken in depositions, which was objected

OCT. TERM
1836.

Waddingham
and others
v.
Gamble.

OCT. TERM
1836.

Waddingham
and others
v.
Gamble.

to, though it was taken within the hours specified in the notice, because the defendant had not arrived in time to cross-examine them. Pierre Chouteau, one of the witnesses, states, "that he knows of Joseph Tayon, now deceased, having a field lot in the common field, west and adjoining to the town of St. Louis, which said field lot, containing one arpent by forty arpents, (meaning that it was one arpent wide, by forty long,) was situated near the place called the Big Mound, and bounded north, as he believes, by one Kiercereau—which said lot, with others, was surveyed in the years 1770 and 1772, by Martin Duralde, by order of Don Pedro Piernas, Lieutenant Governor of Illinois, and at the request of the inhabitants: and that he, the deponent, attended Duralde at the surveying of said lots, as a student surveyor under him. That said Tayon did cultivate said field during at least twenty-five consecutive years, prior to, and since the surveying thereof; and did not cease to cultivate the same until the month of May 1780, or *l' annee du coup*, at which time the common fields were abandoned. That one Jean Baptiste Provenchere, cultivated a field lot situated and lying south of the said field lot of the said Joseph Tayon, which said Provenchere ceased to cultivate in said year 1780. That being informed by Mr. Rene Paul, that John Mullanphy had enclosed a part of the said Tayon's field lot, he, the said deponent, in the presence of the said Rene Paul, told said Mullanphy of it, and required him to have said fence removed, but that Mullanphy replied that he had purchased said land of John B. Provenchere, and would not remove his fence, unless compelled by due course of law."

Evidence was then given on the part of the defendants, of a confirmation by the board of commissioners, to Mullanphy, under Provenchere, in the year 1809, of a tract of land two arpents in front, by forty arpents deep, situated near the town of St. Louis. From the confirmation, it appears that Mullanphy produced before the board of commissioners, a conveyance from the said John Baptiste Provenchere to himself for the same, and that on the application of Provenchere, testimony to establish his claim was received by the board: and several witnesses produced on the part of the defendants below, proved that Provenchere (under whom the defendants, as heirs &c. of John Mullanphy, claim,) cultivated for many years, a field west of the mound above spoken of, and lying near the said mound. From their evidence, it appears that Provenchere ploughed nearly from north to

OCT. TERM
1836.

Waddingham
and others.
.v.
Gamble.

south, and the traces of the furrows yet remain visible—that Provenchere had no separate field—that there was a common field, in which many of the villagers cultivated, one of the witnesses among the rest. The plaintiff then produced Rene Paul, to give testimony to rebut that of the defendants. He stated that, "as deputy surveyor of the United States, under instructions from the Surveyor General, he surveyed the common field lots adjacent to St. Louis, the plat whereof, had been given in evidence, exhibiting the manner in which he surveyed and located the several claims. That his instructions were to locate, first, all the lands for which there were concessions; and secondly, those confirmed without grants to suppport them. And he was instructed also, to get the necessary information for making said surveys, by examining records and taking witnesses on the ground: that the confirmations were all furnished him: that he consulted the Livre Terrien, (provincial land book; above mentioned) and made a plat of the said common field lots, and also had a plat from different persons who had claims, Antoine Riviere, called Bacane, and Rene Dodier, had given to T. Hunt, the recorder of land titles, a list of the lands in said common fields; and he took the said Bacane and Dodier, before he made the surveys, and went upon the land, and they pointed out to the witness the different lots-in the said common fields, and the owners names; and the list so given by them, was the same as that given to Mr. Hunt, the recorder: that he took them across the lands more than once, and they adhered to the same locations of the claims of the persons interested in the common fields. Shortly afterwards, the witness surveyed the said common fields, but the said Bacane and Dodier were not with him then. That in making said survey, he found every corner stone of said surveys, except one or two, where they ought to have been according to such locations of said lands. Said Bacane and Dodier, on the occasion aforesaid, showed the land of John B. Provenchere as lying between Lirette and Guion: Lirette's land once belonged to Chancellier. Witness had several conversations with John Mullanphy respecting said Provenchere's land. Witness told Mulanphy that the arpent opposite to the big mound (the same above mentioned, opposite to which Provenchere, as was testified, cultivated,) was Tayon's. Mullanphy said he claimed two arpents under Provenchere, one under Lirette, one under Vein, and one under Moreau; that he would hold the two arpents south of the mound by his confirmation; and

the land oposite to the mound, he would hold until some person should take it from him by law. The land which the witness surveyed for Provenchere is south of the mound; the north boundary of Provenchere's land, as surveyed by the witness, is five arpens south of the mound. That the said surveys were made in August or September 1826; that if Provenchere's two arpens are located opposite the mound, as contended for by the defendants, it would alter the location of all the tracts north and south of it, in the common fields, as made by witness, according to the connected plat." Other witnesses were examined, whose testimony it is not material to notice here.

It may be proper to remark, that the two persons Dodier and Riviere, called Bacane, mentioned in the testimony of Rene Paul, were two of the witnesses produced by the defendants to prove the locality of Provenchere's cultivation; and that they refer to the testimony formerly given by them to Mr. Hunt, the recorder, as given at an earlier period of their lives, when their memories were more accurate. A survey made by the county surveyor, was given in evidence: he states that he found no corner stones, and gives it as his opinion, "that Mr. Martin Duralde may have located the Joseph Tayon forty arpent lot, one arpent north of where it now stands—its present north boundary becoming thereby its south boundary," quoting, apparently as a reason therefor, the language of Duralde's entry in Livre Terrien, viz: *"Et immediatement d' un cote au domaine du Roi, d' un arpent de large et rasant par son extremite le pied de la monticule appellee la Grange."* As the lot of Tayon is located in the survey made by Rene Paul, it is bounded on its eastern extremity by the foot of the mound, which if the true meaning of the phrase "rasant par son extremite le pied de la monticule"—translated, "grazing by its extremity the foot of the mound;" and this is conformable to the survey of Rene Paul above mentioned. If we suppose with the county surveyor, that it may have been located one arpent further north, then it would not be bounded on the east by the mound at all, but the longer sid of the parallelogram being produced, would pass on the north of the mound, as it is represented on each plat. On this evidence the defendants moved the court to instruct the jury—1st. That if they believed the confirmation to Mullanphy, assignee of Provenchere, covered the land claimed by the plaintiff, then they must find for the defendants. 2.—That if they believed that the land in dis-

pute, was reunited to the domain of the King by the Lieutenant Governor, then they must find for the defendants. 3.—If they believe that Provenchere was in possession of the land in question, and cultivated the same since the year 1793, and before the 20th day of December 1803, then the act of Congress of 13th June 1812, confirmed said land to said Provenchere, or his legal representatives, and the plaintiff cannot recover in this case. 4th.—That the plaintiff got no title under Joseph Tayon to the land in question by the proceedings in partition, and the commissioners' deeds given in evidence. 5th.—That there is no legal evidence that the parties to said proceedings in partition, were heirs of Joseph Tayon deceased.

Opinion of the court.

The first instruction was very properly refused, because no evidence whatever was offered of the location of the land confirmed to Mullanphy; indeed the party appeared studiously to have avoided interrogating their witnesses as the location by the act of Duralde, who was appointed to survey, all their questions being directed to the location of the field which he cultivated. The field cultivated by him being inclosed with those of many others, and the cultivation commenced many years before the survey, and probably before any of them ever thought of having a survey. It would be probably impossible for any surveyor ever to lay off their separate tracts in the shape these lots were surveyed, and at the same time to give to each man his field. The ploughing was from north to south, as testified by several witnesses. The lots, were except two, one arpen in width from north to south, and forty arpens long, from east to west. In all probability the field of Mr. Provenchere crossed the lots of more than six persons of one arpen in width. Habitation and cultivation were the moving considerations of the King of Spain for granting land—all these persons had inhabited and cultivated, and thereby substantially earned the land, and a compromise must be made.

Def. in ejectment claimed title to the land in dispute as assignee of one P, to whom, def. contended, it had been confirmed by the Board of Comm'rs. but offered no evidence of the location of the land confirmed—the court did right in refusing to instruct the jury, that if they believed the confirmation to P. covered the land in question, they must find for def.

- Mr. Provenchere accepted his tract of two arpens in width, by forty in length. It was confirmed to him by the board of commissioners, as surveyed by the authority of the Spanish Lieutenant Governor: and now he contends for land in another place, granted to some other person. The court, as we think, committed no error in refusing the first instruction. 2nd. The second instruction asked, appears most extraordinary. If the land in question were reunited to the royal domain by the act of the Lieutenant Governor, it became the prop-

Nor would it prove title out of pltf. to show that the land was, subsequently to a grant to him from the King of Spain, reunited to the

OCT. TERM
1836.

Waddingham
and others
v.
Gamble.

Domain of the King by the Lieu. Gov.—The U. S who had all the title of the K. of S. having confirmed the land to the pltf. The court did right in refusing to instruct the jury, that if they believed that P. had title to the land in question by possession and cultivation and subsequent confirmation &c. they must find for def. —there being no evidence to prove that the land confirmed to P. in consideration of cultivation and possession was the land in dispute, but strong proof to the contrary.

The judgt. of the cir. ct. in a suit for the partition of land, will not be reversed by the sup. ct. in a collateral suit—objections must come from persons interested.

Depositions taken at the appointed time and place, and at a reasonable time of day, are not to be excluded because the party notified to attend did not arrive until the other party had finished taking the depositions.

erty of the United States, and who shall contest their right to give it to whom they please? No error then, we think, was committed here in refusing this instruction.— 3rd. The answer to this is, that Provenchere had land confirmed to him in consideration of cultivation &c. and that there is no evidence that this is the land: on the contrary, there is the strongest evidence that this is not the land· Furthermore, there is no evidence of the cultivation of this land, after the alleged reunion of the land to the royal domain. Chouteau states that it never was cultivated after "l' annee du coup," viz: 1780, when many of the villagers were massacred by the Indians; and neither of the other witnesses say that it was. There was no error then, in refusing this instruction. 4th and 5th. If there had been any thing incorrect in the proceedings of the circuit court in the prayer for a partition, the objection should have been taken then by some person interested; but this is not done; and the judgment of that court is not to be reversed by this court in a collateral suit. There is no error here then, in refusing these. It was also objected, that the plaintiff finished taking his depositions before the defendant arrived at the place, but not pretended that the hour was at an unreasonable time of the day, or that the plaintiff began to take his depositions before the appointed time. We think, then, that no error was committed here. It is the opinion of this court that the judgment of the circuit court ought to be affirmed, and accordingly it is affirmed.